1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11    MATTHEW H. BECKETT,                    Case No. 1:20-cv-01468-CDB (PC)

12                    Plaintiff,
                                             **ORDER GRANTING DEFENDANTS'**
13          v.                               **MOTION FOR SUMMARY JUDGMENT**

14    SCALIA, *et al.*,                       (Doc. 84)

15                    Defendants.

16

17

18    **I.      INTRODUCTION & BACKGROUND**

19          This action proceeds on Plaintiff's Eighth Amendment excessive force claims against

20    Defendants Scalia, Madrigal and Hernandez, failure to protect/failure to intervene claims against

21    Defendant Hackworth, and Eighth Amendment deliberate indifference to serious medical needs

22    claims against Defendants Scalia, Madrigal, Hernandez, Hackworth, and Hurtado. (*See* Doc. 39.)

23    Plaintiff's claims against these Defendants arose when he was previously incarcerated at

24    Corcoran State Prison.

25          On February 24, 2025, Defendants filed a motion for summary judgment alleging

26    Plaintiff failed to exhaust his administrative remedies. (Doc. 84.) Plaintiff filed an opposition

27    (Doc. 88), and Defendants replied (Doc. 93). Because the parties consented to the jurisdiction of

28    a U.S. magistrate judge, the matter was reassigned to the undersigned for all purposes. (Doc. 74.)

1    ## II.    APPLICABLE LEGAL STANDARDS

2    ### A.  Summary Judgment

3    Summary judgment is appropriate when the moving party "shows that there is no genuine

4    dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

5    Civ. P. 56(a). The moving party "initially bears the burden of proving the absence of a genuine

6    issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing

7    *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by

8    "citing to particular parts of materials in the record, including depositions, documents,

9    electronically stored information, affidavits or declarations, stipulations …, admissions,

10    interrogatory answers, or other materials," or by showing that such materials "do not establish the

11    absence or presence of a genuine dispute, or that an adverse party cannot produce admissible

12    evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). When the non-moving party bears

13    the burden of proof at trial, "the moving party need only prove that there is an absence of

14    evidence to support the non-moving party's case." *In re Oracle*, 627 F.3d at 387 (citing *Celotex*,

15    477 U.S. at 325); *see also* Fed. R. Civ. P. 56(c)(1)(B).

16    Summary judgment should be entered against a party who fails to make a showing

17    sufficient to establish the existence of an element essential to that party's case, and on which that

18    party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322. "[A] complete failure of

19    proof concerning an essential element of the nonmoving party's case necessarily renders all other

20    facts immaterial." *Id.* at 322-23. In such a circumstance, summary judgment should be granted,

21    "so long as whatever is before the district court demonstrates that the standard for the entry of

22    summary judgment … is satisfied." *Id.* at 323.

23    ### B.  Exhaustion of Administrative Remedies

24    The Prison Litigation Reform Act (PLRA) provides that "[n]o action shall be brought with

25    respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner

26    confined in any jail, prison, or other correctional facility until such administrative remedies as are

27    available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion of administrative remedies is

28    mandatory and "unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199,

211 (2007). Inmates are required to "complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006). The exhaustion requirement applies to all inmate suits relating to prison life, *Porter v. Nussle*, 534 U.S. 516, 532 (2002), regardless of the relief sought by the prisoner or offered by the administrative process, *Booth v. Churner*, 532 U.S. 731, 741 (2001).

The failure to exhaust administrative remedies is an affirmative defense, which the defendant must plead and prove. *Jones*, 549 U.S. at 204, 216. The defendant bears the burden of producing evidence that proves a failure to exhaust; and, summary judgment is appropriate only if the undisputed evidence, viewed in the light most favorable to the plaintiff, shows the plaintiff failed to exhaust. *Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014).

In moving for summary judgment on grounds of failure to exhaust, the defendant must prove (1) the existence of an available administrative remedy and (2) that the plaintiff failed to exhaust that remedy. *Id.* at 1172 (citation omitted). If the defendant meets this burden, the plaintiff then "has the burden of production. That is, the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.* (citation omitted). "However, … the ultimate burden of proof remains with the defendant." *Id.*

An inmate "need not exhaust unavailable [remedies]." *Ross v. Blake*, 578 U.S. 632, 642 (2016). An administrative remedy is unavailable "when (despite what regulations or guidance materials may promise) it operates as a simple dead end with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; or when "an administrative scheme [is] so opaque that it becomes, practically speaking, incapable of use, [i.e.,] some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate [the mechanism]"; or "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*. at 643-44.

When the district court concludes that the prisoner has not exhausted administrative remedies on a claim, "the proper remedy is dismissal of the claim without prejudice." *Wyatt v.*

*Terhune*, 315 F.3d 1108, 1120 (9th Cir. 2003) (citation omitted), *overruled on other grounds* by *Albino*, 747 F.3d at 1168-69. "If a motion for summary judgment is denied, disputed factual questions relevant to exhaustion should be decided by the judge." *Albino*, 747 F.3d at 1170. If the court finds that remedies were not available, the prisoner exhausted available remedies, or the failure to exhaust available remedies should be excused, the case proceeds to the merits. *Id*. at 1171.

### C.  CDCR Grievance Process

The California Department of Corrections and Rehabilitation (CDCR) has an administrative grievance system for prisoners to appeal a policy, decision, action, condition, or omission by the department or staff if it has an adverse effect on prisoner health, safety, or welfare. Cal. Code Regs. tit. 15, §§ 3084.1(a) (2018), 3999.226(a). Compliance with 42 U.S.C. § 1997e(a) requires California-state prisoners to pursue CDCR's grievance process to exhaust their claims prior to filing suit in court. *See Sapp v. Kimbrell*, 623 F.3d 813, 818 (9th Cir. 2010); s*ee also Woodford*, 548 U.S. at 85-86. Administrative appeals are generally subject to three levels of review before the remedy is deemed exhausted. Cal. Code Regs. tit. 15, §§ 3084.1(b) (2018), 3084.7(d)(3) (2018), 3999.226(g), 3999.230(h); *see Reyes v. Smith* 810 F.3d 654, 657 (9th Cir. 2016).

### III.    SUMMARY OF THE PARTIES' BRIEFING

#### *Defendants' Motion for Summary Judgment*

Defendants contend Plaintiff did not exhaust his administrative remedies because he failed to appeal his only relevant grievance to the third level of review. Further, Defendants argue Plaintiff failed to exhaust his administrative remedies because Plaintiff's grievance and/or appeal does not name or identify any of the Defendants, and he declined an opportunity to present additional information concerning his grievance. Because Plaintiff failed to appeal to the third level, Defendants maintain they are entitled to summary judgment for Plaintiff's failure to exhaust his administrative remedies.

///

4

1

### Plaintiff's Opposition

2          Plaintiff refers this Court to his response to a summary judgment motion filed in another

3   action, to wit: *Beckett v. Moreno*, case number 1:20-cv-01427-BAM. He contends the assigned

4   judge found the exhaustion of administrative remedies unavailable and states he has appended a

5   copy of his response to the summary judgment motion as Exhibit A to the instant opposition.[1]

6   Plaintiff asserts that because he is not in possession of his property, he cannot provide a copy of

7   the court's "response." He asks this Court to adopt the findings denying summary judgment in the

8   *Beckett v. Moreno* action, asserting those "claims took place in the same prison and are both

9   under this courts Jurisdiction [and] the administrative remedies were directly [impeded] by the

10  very same incidents, officers, and situations." Plaintiff also argues this "case has proven to be a

11  'Prima Facie' Case of merit," and that cases should not be decided upon technicalities but rather

12  on their merits. He asks the Court to deny Defendants' summary judgment motion.

13         ### Defendants' Reply

14         Defendants contend Plaintiff fails to provide a substantive response in opposition to their

15  motion and improperly relies upon a purported prior filing and ruling in a separate action, the

16  docket for which belies Plaintiff's argument. Defendants maintain Plaintiff has failed to present

17  any admissible evidence rebutting Defendants' contention that Plaintiff failed to exhaust his

18  administrative remedies.

19  **IV.   PLAINTIFF'S OPERATIVE COMPLAINT**

20         Upon screening of the second amended complaint, this Court summarized Plaintiff's

21  factual allegations:

22              Plaintiff states that on December 19, 2016, while incarcerated at
            North Kern State Prison, he was beaten while shackled and
23              handcuffed. (Doc. 24 at 7.) One of the individuals involved was
            Sergeant Ozuna. (*Id.*) Plaintiff contends that upon being transferred
24              to CSP-Corcoran, Ozuna stated Plaintiff "had 'Had a Run in' with
            his brother." (*Id.*) Plaintiff states that at that time, Ozuna's brother
25              was named as a defendant in a complaint filed on Plaintiff's behalf
            with the Office of Risk Insurance Management. (*Id.*) Plaintiff asserts
26              that following his meeting Ozuna at CSP-Corcoran, he began to

27

28

---

[1] There was no exhibit attached.

receive what correctional officers called "'Special Treatment' which really meant they would do everything to make one's life a living hell and they did." (*Id*.) Plaintiff states day-to-day interactions included snide, rude or disrespectful comments, to failing to issue property, or stealing or losing property, and refusing to let him attend "groups or yard" and instead reporting Plaintiff refused. (*Id*.) Plaintiff contends the "worst of all was the [staring]." (*Id*.) Further, Plaintiff contends sometimes his meals were withheld or he was not fed. (*Id*.)

Plaintiff contends he wrote appeals when he arrived at CSP-Corcoran. (Doc. 24 at 7.) Plaintiff alleged he was being mistreated, that there was a "'conflict of interest'" on Ozuna's part and requested "'Staff Separation' for [his] protection to no avail." (*Id*.) Plaintiff asserts his attempts to utilize the appeals system always failed, and that "the system and rules were applied so sternly and manipulated on behalf of CDCR officials that it made any chance of receiving relief unavailable." (*Id*. at 7-8.) The system was far too complicated for the average prisoner and emergency appeals were refused "when the situation justifiably required the coordinator to do so." (*Id*. at 8.) He contends correctional officers regularly made examples of inmates, including Plaintiff, who utilized the appeals system, "using violence, over frequent cell searches, and unnecessary uses of force taken way to[o] far." (*Id*.) Plaintiff further asserts inmates were "labeled snitches" by officers, officers would walk past Plaintiff's cell and say "'snitch' regularly and make comments when handing [Plaintiff his] food such as 'We even have to feed all these snitches and child molesters.'" (*Id*.) Plaintiff contends on several occasions officers told other inmates Plaintiff was a snitch and even labeled him a sex offender by "placing a yellow placard for 'Indecent Exposure'" on his cell window in retaliation for his having filed grievances or appeals. (*Id*.) Those actions were taken with malicious intent and placed Plaintiff at risk of hostile attacks from other inmates. (*Id*.) Plaintiff also contends officers stripped him of his necessities several times and provides examples. (*Id*. at 8-9.) Plaintiff asserts officers "planned to attack his neighbor" and when Plaintiff told them he would report them, the officers threatened him with the use of force to "dissuade him from being a witness." (*Id*.) Correctional Officer Bonilla1 said, "'He is a pain in the ass and you don't like him anyway'" and "'We're going to show him [by] going up in there!'" (*Id*.) Plaintiff contends he was subject to frequent cell searches for writing appeals and upon returning to his cell would find his legal and personal property had been taken. (*Id*.) He asserts that in CSP-Corcoran 3A-04 Ad Seg, he had to hand his appeals to correctional officers and "hope/trust that it got to the appeals box" and that "in many cases" his did not. (*Id*.) Plaintiff contends that in some instances the appeals "were read and crumpled right in from of" him and in other instances he would not receive a response, or

the appeal was denied due to time constraints. (*Id.*) Plaintiff indicates "[t]his is a compilations [sic] of just some tactics that were used" against him and "do not even begin to describe the individual mistreatment on any level that created a negative environment so unhealthy that inmates were driven to death by suicide several times." (*Id.* at 10.) On other occasions, inmates committed self-harm and staff taunted or ignored them. (*Id.*)

Plaintiff alleges that on October 4, 2018, after more than 24 hours without food or water, and where officers intentionally broke "the water pipe to" his cell, Plaintiff "had no way to drink or flush" his toilet. (Doc. 24 at 10.) Defendant Scalia "and his partner came" and extracted Plaintiff from his cell. (*Id.*) Plaintiff states he "attempted to assault Scalia w/a right legged mule kick to no avail." (*Id.*) Scalia and his partner "roughed" Plaintiff up, Scalia placing his knee to Plaintiff's neck "for no other reason than to cause pain." (*Id.*) Plaintiff asserts he was laying flat on his stomach, and he was handcuffed and leg shackled. (*Id.*) Four officers were applying their body weight to hold Plaintiff down. (*Id.*) Plaintiff contends he begged Scalia to stop, but Scalia responded, "'Oh no, you wanna play rough, I'll show you just show rough I can be. Not so bad now are you!'" (*Id.* at 10-11.) Plaintiff asserts Defendant Hackworth ordered he be taken to another cell where Lieutenant Gonzales2 had removed the bed and toilet paper. (*Id.* at 11.) Hackworth stripped Plaintiff of his shoes and shorts. (*Id.*) Plaintiff contends the cell had "2 pentagrams written w/smeared human feces," one on the desk and other on a light switch. (*Id.*) Plaintiff had "nothing to clean it with." (*Id.*) When Plaintiff advised Hackworth of same, and that "water barely dribbled down the faucet," Hackworth told Plaintiff he would "'have to earn everything back.'" (*Id.*) Plaintiff contends he endured another day without food and water and was unable to sleep much until another inmate gave him a sheet to cover up with. (*Id.*) Plaintiff asserts he felt as though he may not be able to "endure another day of suffering at the hands of the CDCR staff in 3A-04" and began to consider "committing self harm." (*Id.*) Plaintiff contends that on October 5, 2018, he reported he felt suicidal, but Scalia ignored him. (Doc. 24 at 11.) Plaintiff shouted, "'I need help! Homicidal/Suicidal.'" (*Id.*) He contends he was left for hours, his window covered with cardboard and trash littered the cell, having been "left in the cell prior to [his] being thrown in there." (*Id.* at 11-12.) Plaintiff contends he lost hope and began to fashion a noose. (*Id.* at 12.) After praying, Plaintiff "unboarded and asked to see mental health staff," telling Defendant Scalia that he was having bad thoughts. (*Id.*) When Plaintiff pointed out the noose he had fashioned to Scalia, Scalia told Plaintiff to turn around and cuff up. (*Id.*) As Plaintiff did so, he contends Scalia tried to dissuade him by advising Plaintiff he would be put in an isolation cage for four hours before being returned to his cell. (*Id.*) Plaintiff asserts he panicked, stood up

straight and turned around, facing the door to the cell, telling Scalia he needed help and needed to talk to his clinician. (*Id.*) When Scalia told Plaintiff it was "'too late'" and that Plaintiff would be put in isolation, Plaintiff stated, "'No, I need help.'" (*Id.*) Scalia responded, stating "'Have it your way,'" and spraying "his MK-9 state issued chemical agent." (*Id.*) Plaintiff contends Scalia's "misconductial immediate escalation was carried out due to his anger from the issue the day before." (*Id.*) Plaintiff asserts Scalia "emptied his whole can" before indicating he could get another can and could "'do this all day!'" (*Id.*) Plaintiff was unable to breathe or see, and his "chest and privates" were burning. (*Id.*) Plaintiff asserts he "submitted to cuffs." (*Id.*)

Plaintiff contends that while that was going on, Defendant Hackworth was present and watching, and that he "did nothing along with everyone on the 3A-04 crew." (Doc. 24 at 13.) Plaintiff then heard Hackworth tell Scalia to "'back off go away.'" (*Id.*) Hackworth then ordered Defendants Hurtado and Madrigal to put Plaintiff "into the cages." (*Id.*) Hurtado asked Hackworth whether Plaintiff should be decontaminated; Hackworth replied, "'F…No.'" (*Id.*) Plaintiff asserts "this was done with 'deliberate indifference' directly with the intent to maliciously continue to cause pain." (*Id.*)

Next, Plaintiff contends he was placed in an isolation cage for more than four hours, forced to stand while in a "triangle restraint." (Doc. 24 at 13.) The chemical agent continued to burn and he could not breathe. (*Id.*) Eventually he was "yanked out by the triangle restraint downwards into a wheelchair." (*Id.*) He was "tied up with sheets" around his ankles and torso and was cuffed behind his back. (Id.) Plaintiff contends he could hardly breathe from the chemical agent and the tied sheet and was dizzy. (*Id.*) While "completely subdued/tied to the chair," Defendants Scalia, Hernandez and Madrigal took turns punching Plaintiff with their right fists in succession, while Defendant Hackworth looked on. (*Id.* at 13-14.) Plaintiff alleges "everybody on that crew failed to protect" him. (*Id.*) Plaintiff asserts that "[a]fter taking cheap shots … they decided it would be a good idea to cover [his] face using a 'spit hood.'" (*Id.* at 14.)

Plaintiff contends he was wheeled to triage over the course of "45-50 minutes" while Plaintiff continued to burn from the chemical agent. (Doc. 24 at 14.) He asserts Defendants Hernandez and Madrigal walked slower than normal, insulting him and poking him in the face and chest. (*Id.*) Upon arriving at triage, six officers in black riot gear [fn. omitted] "rat packed" Plaintiff, stated Plaintiff could not have medical attention, and "used techniques like pulling [his] head down or pushing [his] shoulders toward [his] knees," depriving him of oxygen for long periods of time. (*Id.*) Plaintiff

1  contends one of those individuals punched him in the ribs, while
2  others pinched and poked him, taunting him and "inducing
   mania/anxiety." (*Id*.)

3  Plaintiff asserts "CDCR staff including appeals coordinators went to
4  conspirital lengths to thwart the use of the inmate appeal system
   claiming the system unavailable." (Doc. 24 at 14.) Plaintiff contends
5  "Scalia and others" acted with deliberate indifference and "against
   conduct" and training, with the intent to cause unjustifiable and
6  malicious harm. (*Id*. at 14-15.) He endured physical and mental pain
   and trauma "equal to torture" and continues to suffer and will likely
7  do so for the rest of his life. (*Id*. at 15.) Plaintiff asserts Hackworth
8  "showed a lack of caring for human life" by failing to protect him
   from harm and giving "a direct order not to carry out correct
9  procedure" in the form of decontamination. (*Id*.) Plaintiff alleges
   "[m]ultiple violations of civil rights occurred including the 8th, 6th,
10 14th amendments…, including physical injury, mental anguish,
   intentionally depriving [him] of the bare essentials to sustain life."
11 (*Id*.)

12

13 (Doc. 29 at 4-9.) The undersigned determined the following concerning Plaintiff's Eighth

14 Amendment claims of excessive force:

15 Here, liberally construing the second amended complaint, the Court
16 finds Plaintiff has plausibly alleged an Eighth Amendment excessive
   force claim against Defendant Scalia. Plaintiff contends that on
17 October 5, 2018, Scalia deployed an entire canister of a chemical
   agent against Plaintiff while he pleaded for help, retaliating against
18 Plaintiff for his attempt to kick Scalia the day prior and in the absence
   of a legitimate need. Plaintiff also asserts Scalia later punched him
19 while he was restrained in a wheelchair prior to being taken to triage
20 after spending four hours in an isolation cage. Further, Plaintiff has
   plausibly alleged Eighth Amendment excessive force claims against
21 Defendants Madrigal and Hernandez by alleging they also punched
   Plaintiff while he was restrained in a wheelchair prior to being taken
22 to triage after spending four hours in an isolation cage.

23 However, the Court finds Plaintiff has failed to allege any cognizable
24 claim against Defendant Hurtado. The only facts asserted in the
   second amended complaint concerning Hurtado allege only that
25 Hurtado was directed to place Plaintiff is another cell after the
   chemical agent incident, and that Hurtado asked Defendant
26 Hackworth whether Plaintiff should be decontaminated. No facts
   indicate Hurtado struck Plaintiff or took any other action against
27 Plaintiff. Although Plaintiff has been afforded prior opportunities to
   amend his complaint, he will be provided one final opportunity to
28 cure the deficiency regarding his Eighth Amendment excessive force

1
2

> claim against Defendant Hurtado assuming he can do so in good faith.

3

> In sum, Plaintiff has plausibly alleged Eighth Amendment excessive force claims against Defendants Scalia, Madrigal and Hernandez.

4

5 (*Id*. at 10-11.) Concerning Plaintiff's Eighth Amendment claims of a failure to protect and/or

6 intervene, the undersigned found:

7
8
9
10
11
12

> Here, liberally construing the second amended complaint, Plaintiff has plausibly alleged Eighth Amendment failure to protect and failure to intervene claims against Defendant Hackworth. Plaintiff contends Hackworth was present when Scalia deployed the chemical agent and directly refused to allow Plaintiff to be decontaminated after the incident. Plaintiff has also alleged Hackworth was present when Defendants Scalia, Madrigal and Hernandez later punched Plaintiff while he was physically restrained in a wheelchair but failed to intervene.

13 (*Id*. at 12.)² Next, concerning Plaintiff's Eighth Amendment deliberate indifference to serious

14 medical needs claims, the undersigned determined:

15
16
17
18

> Here, liberally construing the second amended complaint, Plaintiff has plausibly alleged a deliberate indifference to serious medical needs claim against Defendant Scalia. This is so because Plaintiff asserts he advised Scalia he was suicidal and in need of help and showed Scalia the noose he had fashioned in his cell, but Scalia refused Plaintiff access to his clinician or other medical assistance.

19
20
21
22
23

> Next, liberally construing the second amended complaint, the Court finds Plaintiff has plausibly alleged deliberate indifference to serious medical needs claims against Defendants Madrigal and Hernandez because Plaintiff contends they significantly delayed the trip from facility 3A-04 to triage, while Plaintiff was restrained in a wheelchair, had been sprayed with a chemical agent and denied decontamination prior to that point, and that Madrigal and Hernandez poked him in the chest and face during the trip to triage.

24
25
26
27

> Additionally, Plaintiff has plausibly alleged a deliberate indifference to serious medical needs claim against Defendant Hackworth by alleging Hackworth was present and aware of his having been sprayed with a chemical agent, but that Hackworth disregarded the risk to Plaintiff's health by refusing to allow Plaintiff to be

28 ² The undersigned also found Plaintiff failed to state a plausible First Amendment retaliation claim against Defendant Scalia (Doc. 24 at 13) and failed to state a due process violation against any named defendant (*id*. at 14-15).

10

decontaminated, directly responding to an inquiry by Hurtado about whether Plaintiff should be decontaminated by replying, "F…, no."

However, the Court finds Plaintiff has failed to allege any cognizable deliberate indifference claim against Defendant Hurtado. No facts indicate Hurtado was deliberately indifferent to Plaintiff's serious medical needs. In fact, Plaintiff asserts Hurtado asked Hackworth about decontamination procedures following the chemical agent incident involving Defendant Scalia. Thus, on these facts, Hurtado cannot be said to have disregarded a risk faced by Plaintiff because Hurtado addressed the risk to his supervisor. Although Plaintiff has been afforded prior opportunities to amend his complaint, he will be afforded one final opportunity to cure the deficiency regarding his Eighth Amendment deliberate indifference claim against Defendant Hurtado assuming he can do so in good faith.

In sum, Plaintiff has plausibly alleged deliberate indifference claims against Defendants Scalia, Madrigal, Hernandez and Hackworth.

(*Id.* at 16-17.)

## V.    EVIDENTIARY MATTERS

Plaintiff has failed to properly respond to Defendants' Statements of Undisputed Facts in support of the motion for summary judgment.

Plaintiff was served with a *Rand* warning that, among other things, explained the import of a summary judgment motion and instructed as follows: "To oppose a motion for summary judgment, you must show proof of your claims. If, as is the case for Defendants' present motion, the motion for summary judgment concerns the exhaustion of administrative remedies, you must submit proof of specific facts regarding the exhaustion of administrative remedies. *See Stratton v. Buck*, 697 F.3d 1004, 1008 (9th Cir. 2012); *Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. April 3, 2014) (en banc)." (Doc. 84-7). The *Rand* notice provided Plaintiff details about how to seek to oppose a summary judgment motion, including by relying on his signed, verified statements, on declarations, and on other evidence, such as deposition transcripts. *Id.* The notice also expressly informed Plaintiff of his obligation to respond to Defendants' Undisputed Facts and described acceptable forms of response. *Id.*

Plaintiff neither reproduced Defendants' itemized facts, nor admitted or denied those facts. Because Plaintiff has not complied with Local Rule 260(b), the Court deems Plaintiff to

11

have admitted those facts. *See, e.g.*, *Beard v. Banks*, 548 U.S. 521, 527 (2006) ("by failing specifically to challenge the facts identified in the defendant's statement of undisputed facts, [plaintiff] is deemed to have admitted the validity of the facts contained in the [defendant's] statement."); *Brito v. Barr*, No. 2:18-cv-00097-KJM-DB, 2020 WL 4003824, at *6 (E.D. Cal. July 15, 2020) (deeming defendant's undisputed facts as admitted after plaintiff failed to comply with Local Rule 260(b)); *see also Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004). Nevertheless, where Plaintiff's verified complaint or evidence submitted in support of his opposition to Defendants' motion for summary judgment bring Defendants' proffered facts into dispute, the Court considered the complaint and any evidence. *Jones*, 393 F.3d at 923 (the court considers as evidence those parts of the verified complaint based on plaintiff's personal knowledge).

## VI.    DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendants offer the following statement of undisputed facts:[3]

1.  There was a grievance system in place when the alleged incident occurred.

2.  The system consisted of three levels and each level needed to be decided on the merits for the claim to be completed or "exhausted."

3.  Beckett submitted a grievance to the Corcoran appeals office on October 22, 2018 that was issued log number CSPC-2-18-05767.

4.  The grievance does not identify any of the defendants.

5.  There are no other grievances submitted by Beckett that involved a staff complaint for conduct that occurred in October 2018.

6.  The grievance bypassed the first level of review and received a second level review. The grievance was reviewed and partially granted.

7.  A letter was sent to Beckett stating he could appeal the ruling to the third level of review.

8.  He has not appealed the decision as of the filing of this motion.

---

[3] The Court elects to combine the undisputed facts rather than separate the facts by issue, thus avoiding duplication.

12

9.   On November 2, 2018, Beckett was provided an opportunity to provide additional

information related to his grievance, but he declined.

(*See* Doc. 84-6 [hereafter UDF].)

## VII.    THE RELEVANT GRIEVANCE OR APPEAL

Plaintiff's relevant grievance or appeal is signed and dated October 17, 2018, and assigned

log number CSP-COR-2-18-05767. Explaining the issue, Plaintiff wrote:

> On Fri. October 5, 2018 I was sprayed w/OC by C/O. I was not
> decontaminated for 15 mins as is required, then I was inserted into a
> ISO cage w/a triangle left on for an excessive [amount] of time. 6:27
> am to 10:36 am. I was also never issued my breakfast, which they
> served while I was burning in the cage.

(Doc. 84-2 at 2, 4.) Plaintiff listed supporting documentation including the 602A attachment (*id.*

at 4) and wrote: "Please note that my issues with mishandling & overcomplicate use of the 602

system" (*id.* at 2). The appeal was bypassed at the first level (*id.* at 2-3) and accepted and

assigned at the second level on or about October 30, 2018 (*id.* at 3).

The second level response indicates the appeal was granted in part, reflecting Plaintiff was

interviewed concerning his appeal. (Doc. 84-2 at 3.) A memorandum dated November 16, 2018,

included the following warning:

> All issues unrelated to the allegation of staff misconduct must be
> appealed separately and will not be addressed in this response. You
> do not exhaust administrative remedies on any unrelated issue not
> covered in this response or concerning any staff member not
> identified by you in this complaint. If you are unable to name all
> involved staff you may request assistance in establishing their
> identity.

(*Id.* at 5.) The memorandum further stated a review had been completed and Plaintiff "was

interviewed on November 2, 2018 by Lt. V. Marmolejo," and that he was "given an opportunity

to provide additional information" concerning his appeal but declined to do so. (*Id.*) After

interviewing witnesses and considering the "CDCR 602 dated 10/17/2018, CDCR 837

Crime/Incident Report dated 10/5/2018, and Holding Cell Log dated 10/5/2018," it was

13

1  determined staff did not violate CDCR policy as alleged in Plaintiff's appeal. (*Id.* at 6.) Plaintiff

2  was further advised as follows:

3          If you wish to appeal the decision and/or exhaust administrative
         remedies, you must submit your staff complaint appeal through all
4          levels of appeal review up to, and including, the Secretary's/Third
         Level of Review. Once a decision has been rendered at the Third
5          Level, administrative remedies will be considered exhausted.

6

7  (*Id.*)

8          **VIII.   DISCUSSION**

9          This Court must determine whether Plaintiff exhausted his administrative remedies

10  regarding his Eighth Amendment claims against Defendants Scalia, Madrigal, Hernandez,

11  Hackworth, and Hurtado.[4] In reaching this decision, the merits of Plaintiff's claims need not be

12  and are not addressed. Defendants' summary judgment motion concerns the exhaustion of

13  administrative remedies only. *See, e.g.*, *Williams v. Thompson*, No. 1:19-cv-00330-AWI-CDB

14  (PC), 2023 WL 2823388 at *1 (E.D. Cal. Apr. 7, 2023) ("at this stage of the proceedings,

15  defendants' motion for summary judgment is based on non-exhaustion of remedies and does not

16  address the merits of his constitutional claims"). To the extent Plaintiff argues his case should not

17  be decided on "technicalities," Plaintiff is advised the PLRA is mandatory. 42 U.S.C. § 1997e(a).

18  In other words, exhaustion of administrative remedies is not a technicality to be overlooked in

19  favor of a merits-based determination.

20          ***Defendants are Entitled to Summary Judgment***

21          Defendants' evidence establishes there was an administrative remedy available to Plaintiff

22  at California State Prison-Corcoran. *See* UDF 1-2. Further, Defendants' evidence establishes that

23  Plaintiff failed to exhaust his remedy concerning his claims against Defendants by failing to

24

25

26  ───────────────
[4] In arriving at its determination, the Court carefully reviewed and considered all arguments, points and authorities,
27  declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed
by the parties. Omission of reference to an argument, document, paper, or objection does not reflect that the Court
did not consider the argument, document, paper, or objection. To the contrary, the Court thoroughly reviewed and
28  considered the evidence it deemed admissible, material, and appropriate.

appeal to the third level of review. *See* UDF 3, 5-8. Moreover, Defendants' evidence establishes Plaintiff failed to identify any named Defendant in his appeal. *See* UDF 4, 9.[5]

Even viewing the evidence in the light most favorable to Plaintiff, the Court finds Defendants have met their initial burden of showing the existence of an available administrative remedy and that Plaintiff failed to exhaust that remedy concerning his Eighth Amendment claims against Defendants. *Albino,* 747 F.3d at 1166, 1172. The burden now shifts to Plaintiff to "come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.*

Plaintiff fails to meet his burden of production. Because Plaintiff neither admitted nor denied Defendants' UDFs, those facts are deemed admitted. *Beard*, 548 U.S. at 527. Nevertheless, the Court turns to a review of Plaintiff's second amended, verified complaint. *Jones*, 393 F.3d at 923.

In his second amended complaint, Plaintiff acknowledges administrative remedies were available at the institution and that he submitted a grievance or appeal. (Doc. 24 at 3.) Plaintiff also states that "[d]ue to obstructions of the grievance system I was unable to get relief at the highest level" and that "[i]f given the [opportunity], I will clearly demonstrate why the grievance system was obstructed and made unusable to the highest level." (*Id.* at 3, 4-6.) In a later section of the second amended complaint, Plaintiff recounts events occurring at North Kern State Prison involving "Sgt. Ozuna," who allegedly obstructed Plaintiff's efforts to appeal at that facility upon his arrival. (*Id.* at 7.) Thereafter, Plaintiff asserts the following:

> All my attempts to utilize the appeals system always failed, the
> system and rules were applied so sternly and manipulated on behalf
> of CDCR officials that it made any chance of receiving relief
> unavailable. The system and the appeals coordinators who ran the

---

[5] A prisoner's failure to list all staff members involved in an incident in his grievance, or to fully describe the involvement of staff members in the incident, will not necessarily preclude exhaustion of administrative remedies. *See Woodford*, 548 U.S. at 90-91; *McClure v. Chen*, 246 F. Supp.3d 1286, 1291 (E.D. Cal. Mar. 28, 2017) (citing *Reyes*, 810 F.3d at 658). However, "there must be a 'sufficient connection' between the claim in the appeal and the unidentified defendants such that prison officials can be said to have had 'notice of the alleged deprivation' and an 'opportunity to resolve it.'" *McClure*, 246 F.Supp.3d at 1291 (quoting *Reyes*, 810 F.3d at 659); *see Estrada v. California Corr. Inst.*, No. 1:18-cv-00599-AWI-SAB (PC), 2021 WL 3268555, at *8 (E.D. Cal. July 30, 2021) adopted by 2021 WL 4123686 (E.D. Cal. Sept. 9, 2021) (finding the plaintiff failed to properly exhaust his administrative remedies because he did not name the defendant or specifically describe his alleged wrongdoing as required by CDCR's regulations). Here, Plaintiff fails to reference any individual by name.

15

reviewing made it far [too] complicated for the average prisoner while at the same time ignoring the nature of the complaint, refusing to ever grant "emergency" processing when the situation justifiably required the coordinator to do so according to California State and Federal Regulations. … CO's regularly made "examples" of inmates including myself who utilized the appeals system using violence, over frequent cell searches, and unnecessary uses of force taken way [too] far. Inmates were labeled snitches by officers. They would walk past my cell and say "snitch" regularly and make comments when handing me my food such as "We even have to feed all these snitches and child molesters." … On several occasions CO's told other inmates I was a snitch and even went as far as to label me a "sex offender" by placing a yellow placard for "Indecent Exposure" on my cell window. This was done in retaliation for me writing 602s. By labeling with these names CDCR officials acted w/ "malicious intent" as it created a very real likeliness for hostile attacks from other inmates to occur. … Officers also acted maliciously and sadistically by stripping me of my basic necessities such as food and water which happened to me several times. … An example related occurred on 10-3-18 at [approximately] 6:30 am an officer went into the pipe chase where the plumbing for the cell I was in was and I heard loud banging on the pipes, water ran onto the tier, and CO Torres came out and said "Ope, looks like no water for you." I was left in the cell with no water or lunch or dinner. … For a period of time equaling to over 6 months inmates who were only allowed one pen filler to be exchanged when empty, were not given pen fillers or forms such as CDCR 22's and 602's so that there was no access to the grievance or court system. … When officers planned to attack my neighbor I told them I'd report them and they threatened me with use of force to [dissuade] me from being a witness. CO Bonilla said "He is a pain in the ass and you don't like him anyway" and "We're going to show him" by "going up in there." I was told by Bonilla's partner that if I reported it he "Had something for that [my] ass!" … Over frequent cell searches were a given for me writing appeals. When I'd return to my cell I'd find that courts and appeal documents and personal property were taken. That happened to my grievances on several occasions. … In Corcoran 3A-04 which is an ad-seg I had to hand my appeals to CO's and hope/trust that it got to the appeals box, in many cases mine didn't. Some were read and crumpled right in front of me. There were times I'd receive an appeal back and there would be no response like it had never made it to appeals [coordinators]. I'd sent it back in and it would say it was denied due to time constraints. This is a [compilation] of just some tactics that were used on me and do not even begin to describe the individual mistreatment on any level that created a negative environment so unhealthy that inmates were driven to death by suicide several times, plus countless attempts acts of self harm, many of which the inmates making staff aware of their distress were told "Do it then," "Your not

16

1
2
3

> going to do it," "cut deeper," and most often heard by CO's and ignored. Instead of helping they would taunt, torment and push multiple inmates to losses of life and in many cases, mine, caused physical and mental scars that will not easily heal if they ever do.

4

(*Id*. at 7-10.)

5      Even presuming the above happened at Corcoran, Plaintiff fails to establish unavailability

6  concerning the relevant procedures. First, many of his assertions are not based on personal

7  knowledge and amount to nothing more than legal conclusions. For example, Plaintiff asserts that

8  appeals coordinators refused to grant "emergency" grievances or appeals where they were

9  required to do so. Because Plaintiff is not speaking about his own grievance or appeal, he

10 demonstrates no personal knowledge concerning other inmates' grievances, emergency or

11 otherwise, and cannot know whether any denial was justified. Another example involves

12 Plaintiff's inference that other inmates lost their lives due to purported mistreatment by staff,

13 presumably related to the grievance system. Plaintiff's verified statements do not demonstrate any

14 basis upon which he could have personal knowledge that other inmates, as Plaintiff asserts, were

15 "driven to death by suicide" because the grievance system was made unavailable to those other

16 inmates.

17     Nor can it be said Plaintiff has personal knowledge concerning "over frequent cell

18 searches" – Plaintiff offers no evidence to establish any cell search was not justified. Further,

19 concerning Plaintiff's assertions that for a six-month period "inmates" had no access to "pen

20 fillers or forms such as CDCR 22's and 602's," Plaintiff fails to assert that *he* was deprived of a

21 writing instrument or any requested form. Plaintiff's legal conclusions and unsupported

22 allegations do not overcome Defendants' evidence that Plaintiff failed to exhaust his

23 administrative remedies. *See Fuqua v. Ryan*, 890 F.3d 838, 844 (9th Cir. 2018) (on summary

24 judgment, once defendant satisfies burden of showing administrative remedies were available and

25 plaintiff failed to exhaust them, plaintiff bears burden of showing the remedies were unavailable);

26 *Sapp*, 623 F.3d at 823-24 (plaintiff bears burden of demonstrating exception to exhaustion

27 requirement based on prison officials' misconduct thwarted attempts to exhaust remedies); *Tate v.*

28 *Nakashyan*, No. 1:22-cv-00624-SKO, 2024 WL 4770300, at *8 (E.D. Cal. Nov. 13, 2024)

("Vague and conclusory allegations are insufficient to create a genuine dispute of material fact," citing *Sapp*, 623 F.3d at 823-24); *Jeffries v. Fields*, No. CV 12-1351 R(JC), 2014 WL 994908 *18 (C.D. Cal. Mar. 10, 2014) (stating conclusory allegations are insufficient to demonstrate that failure to exhaust was excused by prison officials' misconduct).

Second, to the extent Plaintiff's assertions do involve his personal knowledge —e.g., officers labeling Plaintiff a "snitch," placing a sex offender placard on his cell window in retaliation for his writing 602's, and stripping him of "basic necessities such as food and water" — his unsupported allegations do not overcome Defendants' evidence that Plaintiff failed to exhaust his administrative remedies or create a genuine material dispute. The Ninth Circuit has held that "[t]he threat of retaliation for reporting an incident can render the prison grievance process effectively unavailable and thereby excuse a prisoner's failure to exhaust administrative remedies." *McBride v. Lopez*, 807 F.3d 982, 987 (9th Cir. 2015). To avoid the exhaustion bar on the ground of a fear of retaliation, a prisoner must show both a subjective and objective basis for that fear. *Id*. at 987-88. To meet the subjective prong, the prisoner must "provide a basis for the court to find that he actually believed prison officials would retaliate against him if he filed a grievance" and that he was actually deterred from filing a grievance. *Id*. To meet the objective prong, "there must be some basis in the record for the district court to conclude that a reasonable prisoner of ordinary firmness would have believed that the prison official's action communicated a threat not to use the prison's grievance procedure and that the threatened retaliation was of sufficient severity to deter a reasonable prisoner from filing a grievance." *Id*. at 987.

Even assuming Plaintiff satisfied the subjective grounds concerning a fear of retaliation, he fails to meet the objective prong of the test. There is no basis in the record to conclude that any threatened retaliation was of sufficient severity to deter Plaintiff from appealing after the second level denial to the third or highest level. In particular, Plaintiff's allegations that correctional officers took certain adverse action against him (*i.e.*, placing a sex offender placard on his cell and depriving him of food) *because* Plaintiff engaged in the grievance system is merely an allegation unsupported by evidence. Plaintiff's allegations are akin to those the Ninth Circuit in *McBride* found were insufficient to conclude administrative remedies were unavailable. *Id*. at 988

18

1   (noting that while a correctional officer's statements could be interpreted as threatening, "the

2   statements themselves ma[de] no reference to a grievance or to anything else, beyond the

3   preexisting hostility, that might trigger a future attack on the part of the guards"); *see Rodriguez*

4   *v. Cnty. of Los Angeles*, 891 F.3d 776, 792 (9th Cir. 2018) ("general and unsubstantiated fears

5   about possible retaliation" are insufficient) (citing *McBride*, 807 F.3d at 987-88).

6           Separately, a defendant's failure to process a grievance or delayed response to a grievance

7   may make the grievance process unavailable. *Ross*, 578 U.S. at 643; *Brown v. Valoff*, 422 F.3d

8   926, 943 n.18 (9th Cir. 2005). Significantly here, there is no indication that prison officials failed

9   to process or delayed any grievance or appeal relating to the incidents occurring on October 5,

10  2018. And Plaintiff's vague and conclusory assertions in his second amended complaint

11  pertaining to unavailability do not reference specific dates. Rather, as this record establishes, and

12  despite any action by "CO Torres" a day or two prior to the incident giving rise to his claims,

13  Plaintiff filed an appeal concerning the events of October 5, 2018. The appeal was bypassed at the

14  first level and then considered at the second level. This record further reveals that Plaintiff failed

15  to appeal to the third or highest level, and Plaintiff proffers no evidence whatsoever to

16  demonstrate unavailability of the third or highest level of review.

17          Additionally, the Court has reviewed Plaintiff's deposition transcript lodged electronically

18  with the Court by Defendants. (*See* Doc. 91.) Plaintiff testified he filed a "602 related to" the

19  October 5, 2018, incident assigned log number "18-5767." (Beckett Depo., at 21-22.) Further,

20  Plaintiff testified he filed another grievance related to the incident bearing log number "18-3051"

21  on June 19, 2018. (Beckett Depo., at 22.) He also testified he filed an appeal assigned log number

22  "18-3204," that involved a determination at the third level. (Beckett Depo., at 23-24.) Plaintiff

23  testified all three —numbers 18-3051, 18-3204 & 18-5767— "deal with the October 5th

24  incident." (Beckett Depo., at 24.) However, Plaintiff later testified log number 18-3204 concerns

25  a "classification committee chrono dated 8/21/2018." (Beckett Depo., at 24.) Plaintiff then

26  testified that log number 18-3051 concerns an incident "on 6/19/18" (Beckett Depo., at 25.), an

27  incident that predates the incident giving rise to his claims in this action. When Plaintiff was

28  asked whether he had "a third-level response for the one with the last four [digits] of 5767," he

1   replied, "Yes, I do. Yes, I do. It is right here." (Beckett Depo., at 25.) He then testified, "I thought

2   I had it in here. However, I was not exactly prepared for this, and I'll just go on to say, as I said,

3   also that 602 - - the availability of the 602 system was, it was basically unavailable to the fact

4   that - - well, I guess that's for me to take up with the Court, so …." (Beckett Depo., at 25-26.)

5   After discussing the allegations made in his complaint and his recollection of the incident,

6   Plaintiff testified that "Appeal Number 0567 [sic 5767], and that was granted at - - partially

7   granted at level two, and so there was never a level three." (Beckett Depo., at 39-40.) Thus,

8   following a review of Plaintiff's deposition testimony, the evidence before the undersigned

9   indicates Plaintiff did not exhaust his administrative remedies to the highest level, nor does

10  Plaintiff's testimony indicate that Plaintiff's failure to do so was the result of any unavailability.

11  *See McBride*, 807 F.3d at 988 (recognizing that "[t]here is no reason to allow inmates to avoid

12  filing requirements on the basis of hostile interactions with guards when the interaction has no

13  apparent relation to the use of the grievance system. Hostile interaction, even when it includes a

14  threat of violence, does not necessarily render the grievance system 'unavailable'").

15          Next, the Court addresses Plaintiff's request that it adopt an opposition to summary

16  judgment he purportedly filed in another action filed in this Court titled *Beckett v. Moreno*, case

17  number 1:20-cv-01427-BAM. The Court takes judicial notice of the docket for that action. *See*

18  *Harris v. Cnty. of Orange*, 682 F.3d 1126, 1131-32 (9th Cir. 2012) (court may take judicial notice

19  of "documents on file in federal or state courts"). A review of the docket supports Defendants'

20  contention that there was no finding of unavailability in that action. The docket reveals the

21  Defendants filed a motion for summary judgment on July 16, 2021 (20-1427 Docket Entry 27),

22  and that when Plaintiff failed to file an opposition to the motion after numerous extensions of

23  time, the action was dismissed on May 6, 2024, for Plaintiff's failure to prosecute and failure to

24  obey court orders (20-1427 Docket Entry 64).

25          Lastly, to the extent Plaintiff's opposition to Defendants' summary judgment motion

26  relies solely on the allegations asserted in his original complaint ("[this] case has proven to be a

27  'Prima Facie' Case of merit"), such reliance is insufficient to meet his burden of production. Fed.

28  R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586, n.11.

In sum, this Court concludes that the relevant grievance or appeal did not exhaust Plaintiff's administrative remedies regarding his Eighth Amendment claims against Defendants Scalia, Madrigal, Hernandez, Hackworth, and Hurtado. Therefore, Defendants are entitled to summary judgment.

### IX.    CONCLUSION AND ORDER

Accordingly, for the reasons stated above, Defendants' motion for summary judgment based upon Plaintiff's failure to exhaust administrative remedies (Doc. 84) is **GRANTED**. Judgment shall be entered for Defendants and this action closed.

IT IS SO ORDERED.

Dated:    **August 5, 2025**                    _____
                                                                   UNITED STATES MAGISTRATE JUDGE